FILED

2005 SEP -8 PM 2: 22

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| Texas Cable & Telecommunications Association, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| Rick Perry, in His Official Capacity as Governor of Texas, | ) ) ) |
| Paul Hudson, in His Official Capacity as Chairman of the Public Utility Commission of Texas, | ) ) ) ) |
| Julie Parsley, in Her Official Capacity as Commissioner of the Public Utility Commission of Texas, and | ) ) ) ) |
| Barry Smitherman, in His Official Capacity as Commissioner of the Public Utility Commission of Texas, | ) ) ) ) ) |
| Defendants. | ) ) |

Case No.: **A05CA721 LY**

## COMPLAINT

Plaintiff Texas Cable & Telecommunications Association ("TCTA"), by its

attorneys, alleges as follows:

### NATURE OF THE ACTION

1.     This lawsuit challenges the "Act Relating to Furthering Competition in

the Communications Industry," S.B. 5, 79th Leg., 2d Sess. (Texas 2005) ("the Act"),

an Act of the Texas Legislature that went into effect yesterday, September 7, 2005.

*1*

As shown herein, the Act denies cable operators rights that are protected by federal and state law. In particular, the Act without justification and in violation of federal and state constitutional and statutory law discriminates against existing cable operators. In addition, the Act violates federal law relating to so-called "redlining" (discrimination against consumers on the basis of their income). Plaintiff requests that the Court grant declaratory and injunctive relief.

## PARTIES

2.    Plaintiff TCTA is the main trade organization for cable operators in Texas. Based in Austin, TCTA has represented the cable industry in Texas for the past 45 years, providing its member companies with a unified voice on issues that affect the Texas cable industry. Each of TCTA's members is a cable operator providing cable service in one or more service areas within Texas.

3.    Defendant Rick Perry is the Governor of Texas. Defendant Paul Hudson is the Chairman of the Public Utility Commission of Texas ("PUC"). Defendants Julie Parsley and Barry Smitherman are Commissioners of the PUC. Defendants are responsible for the enforcement and execution and enforcement of the Act. Defendants have been, are currently, and will be acting under color of authority and law of the state of Texas. Defendants are sued only in their official capacity.

## JURISDICTION AND VENUE

4.    Although some of plaintiff's claims arise under state law, most arise under federal law, including the Supremacy Clause of Article VI of the United States Constitution, the Freedom of Speech and Press Clauses of the First Amendment to the

United States Constitution, the Due Process and Equal Protection Clauses of the

Fourteenth Amendment to the United States Constitution, various provisions of the

Federal Communications Act, 47 U.S.C. §§ 151, *et seq.*, and 42 U.S.C. § 1983.

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and

2201. Declaratory relief is warranted pursuant to 28 U.S.C. §§ 2201 and 2202.

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). This

is so because all Defendants maintain offices within the State of Texas, all Defendants

reside within the State of Texas, and at least one Defendant resides within this

District. Moreover, because both Governor Perry and the PUC conduct business

from offices in Austin, Texas, a substantial part of the events giving rise to plaintiff's

claims occurred in this District. Finally, a substantial part of the cable systems and

other property that are the subject of this action are situated within this District.

## BACKGROUND

6.     For a full understanding of the Act's illegality, it is necessary to

describe: (a) the way in which cable operators have traditionally received franchises;

(b) recent and imminent entry into the video business by telephone companies; (c) the

Act's adoption and content; and (d) the harm that the Act inflicts.

### A.     Traditional Cable Franchising.

7.     Cable operators use cable systems to provide video programming,

primarily to residential customers. Cable operators transmit various kinds of video-

programming signals, including the signals of local broadcast stations (*e.g.*, KXAN

(NBC), KEYE (CBS), and KVUE (ABC)), national non-broadcast programming

services (*e.g.*, HBO and ESPN), and programming that they produce themselves (*e.g.*, News 8 Austin). Both by originating programming that they produce themselves and by selecting programming that is produced by others, cable operators engage in constitutionally protected speech.

8.     Cable operators are subject to vigorous competition from, among others, DBS operators (companies like DirecTV, which provide video service via so-called Direct Broadcast Service satellites) and "overbuilders" (companies like Grande, which build cable systems in areas that are already served by another cable operator). During the past decade, most cable operators have made substantial investments in upgrading their systems, which has enabled them to provide more and better video service, and also to provide non-video service, such as high-speed Internet service and telephone service.

9.     Cable operators cannot provide service without using public rights-of-way to deploy their underground and aerial cable plant. When cable operators first began constructing cable systems in the 1950s, 1960s, and 1970s, they did so pursuant to permission from municipalities. These municipalities often used their ability to withhold such permission to extract cable operators' agreement to wide-ranging regulatory obligations relating to, among other things, public-access channels and "franchise fees." In Texas and most other states, there has been little or no cable regulation at the state level.

10.     In 1984, however, the United States Congress added a new Title VI to the Federal Communications Act to regulate the cable-franchising process. *See*

*generally* 47 U.S.C. § 521, *et seq.* Title VI generally (though not exclusively) addresses "cable service" provided by a "cable operator" over a "cable system," each of which is a defined term. *See id.* § 522. Congress's primary objective was to "establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems." *Id.* § 521(3). In particular, Congress sought to "establish a national policy concerning cable communications" under which local governments would operate within uniform federal standards. *Id.* § 521(1); *see also* H.R. Rep. No. 98-934, at 19 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655 ("*1984 House Report*") (goal of Title VI was to create a "national policy that clarifies the current system of local, state and Federal regulation of cable television").

11.     Title VI reaffirmed local authorities' right to grant franchises; indeed, it provided that "a cable operator may not provide cable service without a franchise." 47 U.S.C. § 541(b)(1). But, in light of the interstate nature of cable service, Congress recognized that local authorities would be allowed to exercise their powers only in accordance with "certain important uniform Federal standards." *1984 House Report* at 24. To implement this national franchising scheme, Title VI (as enacted and as later amended) creates a federal framework to guide and constrain the franchising process.

12.     For example, Title VI provides that franchising authorities must ensure that cable operators do not engage in so-called "redlining" (*i.e.*, that they do not refuse to construct facilities in low-income or minority areas that they may view as less profitable): "[i]n awarding a franchise or franchises, a franchising authority shall

assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides." 47 U.S.C. § 541(a)(3). "Under this provision, a franchising authority in the franchising process shall require the wiring of all areas of the franchise area to avoid this type of practice." *1984 House Report* at 59.

13.    Title VI also prohibits franchising authorities from granting "exclusive franchise[s]": franchising authorities "may not unreasonably refuse to award an additional competitive franchise." *Id.* § 541(a)(1). Thus, local franchising authorities may not grant cable operators a *de jure* monopoly in providing cable service, and may not deny franchises to overbuilders. More generally, Congress wished to "promote competition in cable communications" through even-handed regulation. *Id.* § 521(6). Where Congress wished to deviate from its uniform federal scheme, and intended competition to occur on other than a level-playing-field basis, it specifically provided for it. *See, e.g., id.* § 543(a)(2) (exempting overbuilders from rate regulation); *id.* §§ 571, 573 (exempting certain common carriers providing video service from specifically enumerated kinds of cable regulation); *id.* § 572(d)(3) (permitting overbuilders to be acquired where incumbent cable operators would not be).

**B.    Video Entry by Incumbent Local Exchange Carriers.**

14.    Companies like Verizon and SBC provide local telephone service and are known as "incumbent local exchange carriers" or "ILECs." Local telephone service for residential customers has long been viewed as a natural monopoly. As a result, ILECs have long enjoyed unchallenged market power in their service areas.

- 6 -

Through mergers, some ILECs have become corporate behemoths. For example, Verizon and SBC are two of the largest companies in the world, with annual revenues of more than $70 billion and $40 billion, respectively.

15.     Although ILECs used to be prohibited from providing video service, *see* 47 U.S.C. § 533(b)(1) (1996), Congress repealed that ban in 1996, *see Telecommunications Act of 1996*, Pub. L. No. 104-104, 110 Stat. 56, § 302(b)(1) (1996). To date, most ILECs have not taken advantage of the opportunity, but, recently, some ILECs have announced plans to upgrade their facilities to provide video service. Verizon has stated that it can begin providing video service later this year. SBC has stated that it expects that, by 2007, it will offer video service to half of its existing customers (or 18 million households).

16.     As noted, federal law provides that "a cable operator may not provide cable service without a franchise." 47 U.S.C. § 541(b)(1). Accordingly, Verizon and SBC may not implement their video plans until they have obtained franchises. Verizon has acknowledged as much, and has obtained franchises in numerous municipalities, including Keller, Wylie, Sachse, and Westlake in Texas. SBC has sometimes asserted that its video service would not qualify as a "cable service" or that its networks would not be "cable systems," but that argument is plainly wrong and apparently provides only cold comfort to SBC itself.

17.     This is obvious from SBC's campaign to lobby state legislatures to obliterate local franchising and to award companies like SBC and Verizon a single franchise at the state level. Unwilling to negotiate franchises with municipalities,

these companies have pressed for statutes under which they would receive state-issued franchises that would allow them to offer video service anywhere in the state where they want to, subject to only minimal regulation that does not include anti-redlining and build-out requirements.  At the same time, these corporate giants have brought to bear their lobbying clout to jockey for unfair competitive advantage by seeking to deny the same advantageous treatment to existing cable operators.

18.    Texas has been no exception.  According to a watchdog group, SBC has been "Austin's leading lobby force by far," with an "army of 123 lobbyists who reported up to $6.8 million in SBC fees."  Texans for Public Justice, *Lobby Watch* (Aug. 18, 2005), *available at* http://www.tpj.org/page_view.jsp?pageid=886&pubid=649.  "Verizon . . . paid 38 lobbyists another $1.8 million.  As such, SBC and Verizon lobbyists outnumbered the 150-member Texas House." *Id.*  As one of the group's officials put it, "[t]he only way to adequately recognize this feat is to rename the Capitol 'SBC Arena.'"  Claudia Grisales, *Phone Industry Outlobbied, Outspent Cable Rivals in Legislative Fight*, Austin American-Statesman, Aug. 18, 2005, *available at* http://www.statesman.com/search/content/shared/money/stories/0508/TELECOM_TEXAS_0818_COX.html.

**C.    The Act.**

19.    SBC and Verizon got the statute they wanted.  The Act amends Subtitle C, Title 2, of the Texas Utilities Code by adding a new Chapter 66 (of which a copy is attached to this Complaint) entitled "State-Issued Cable and Video Franchise."  The Act generally authorizes (indeed, requires) the PUC to issue certificates of franchise

authority where an applicant makes a few rudimentary self-certifications. *See* Tex. Util. Code Ann. § 66.003(b), (c).

20.    While the bill makes new entrants eligible for a state-issued franchise, *see id.* §§ 66.003(a), 66.004(a), it expressly makes most existing cable operators ineligible "until the expiration date of the[ir] existing franchise agreement," *id.* § 66.004(a). Thus, the bill specifically perpetuates obligations imposed by existing municipal franchise agreements. One might think that the Legislature so provided lest it upset settled expectations grounded in existing franchise agreements. But the Act specifically permits overbuilders (defined as providers that are "not the incumbent cable service provider and serv[e] fewer than 40 percent of the total cable customers in a particular municipal franchise area") to "elect to terminate [their] municipal franchise and seek a state-issued certificate of franchise authority." *Id.* § 66.004(b).

21.    Although the Act does impose some obligations on holders of state-issued franchises, those obligations are significantly less onerous than the burdens that municipal franchises generally impose on cable operators. Municipal franchise agreements tend to be lengthy and comprehensive and include significant regulation of a cable operator's business. By contrast, the Act contains only a few pages addressing obligations applicable to holders of state-issued franchises. And many of those pages are devoted to making clear that particular kinds of obligations may *not* be imposed. For example, the Act in many cases excuses holders of state-issued franchises from complying with customer-service standards. *See id.* § 66.008.

22.     Moreover, the Act specifically precludes the PUC from imposing the kinds of anti-redlining protections commonly found in franchise agreements. The Act permits new entrants themselves to define the "footprint to be served within the municipality" without any regulatory oversight. *Id.* § 66.003(b)(4). By making issuance of franchises mandatory when an applicant makes the required self-certifications, *see id.* § 66.003(b), the Act does not allow the PUC to take any protective steps. To the contrary, the Act specifically prohibits the PUC from imposing build-out requirements (requirements compelling cable operators to build facilities in particular areas by a particular date that municipalities commonly impose to combat redlining). *See id.* § 66.007. Even within the service footprint that entrants may themselves define, they need not provide service on a uniform basis: the Act allows them to provide service "through the use of an alternative technology that provides comparable content, service, and functionality." *Id.* § 66.014(d).

23.     These provisions caused one legislator to lament that she was "saddened today that we are in such a rush to do such damage to our communities and to the citizens that we represent." S.B. 5 on Third Reading, Address by Rep. Y. Davis on a Matter of Personal Privilege, at 2, *available at* http://www.txcable.com/News/Davis.asp. Unfortunately, there is evidence that her concern is justified: last year, an SBC presentation to investors proudly proclaimed that, while SBC's video service will reach approximately 90% of "high-value" customers and 70% of "medium-value" customers, it will reach only 5% of "low-value" customers. *See* http://media.corporate-ir.net/media_files/irol/11/113088/111104_color.pdf, at 14.

- 10 -

### D.    Harm Inflicted.

24.    As a result of the Act's passage, TCTA's cable-operator members have suffered and will suffer injury, including, but not limited to, actual and potential loss of revenues, damage to reputation and goodwill, and other harm.  In particular, state-issued franchises will result in an uneven competitive playing field, thereby unfairly and unlawfully impairing incumbent cable operators' ability to compete.  In addition, the Act imposes various obligations that entail additional out-of-pocket costs.

25.    As a trade association, TCTA has standing to sue because its members would have standing to sue in their own right, because the injury of which TCTA complains is germane to TCTA's purpose, and because the instant litigation does not require the participation of individual TCTA members.

26.    There is no adequate remedy at law.

### COUNT I

### (Discrimination in Violation of U.S. and Texas Constitutions)

27.    Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

28.    The Act is discriminatory: it applies little, if any, regulation with respect to new entrants and overbuilders, while specifically perpetuating and re-affirming more onerous regulation with respect to incumbent cable operators, even while allowing overbuilders to opt out.  These distinctions are not tailored to any legitimate justification.

29.    The discrimination effected by the Act violates cable operators' rights under the Freedom of Speech and Press Clauses of the First Amendment to the United

States Constitution; the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution; the Due Process and Equal Protection Clauses of Article I, Sections 3 and 19 of the Texas Constitution; the Special Laws Clause of Article III, Section 56 of the Texas Constitution; and the Liberty of Speech and Press Clauses of Article I, Section 8 of the Texas Constitution.

30.     Insofar as the Act conflicts with the Federal Constitution, the Act is pre-empted and superseded by the Supremacy Clause.  Insofar as the Act conflicts with the Texas Constitution, it is null and void for that reason.

## COUNT II

### (Discrimination in Violation of the Federal Communications Act)

31.     Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

32.     Title VI of the Federal Communications Act establishes a uniform national regulatory scheme for providers offering a "cable service" over a "cable system" (as those terms are defined in the Federal Communications Act).  Congress created this scheme because it had long recognized the inherently interstate nature of video programming delivery, the benefits to consumers and competition that flow from uniform national regulation of interstate services, and the resulting need to avoid a patchwork of inconsistent local regulations applicable to video programming.

33.     The new Texas Act establishes different sub-classifications of providers (new and overbuilding cable and video service providers, on the one hand, and incumbent cable service providers, on the other) and subjects them to differential

regulatory treatment even if their service offering falls within the definition of a "cable service" under the Federal Communications Act.

34.    Congress, however, adopted a federal policy even-handedly to "promote competition in cable communications." 47 U.S.C. § 521(6). Where Congress wished to deviate from its uniform federal scheme, and intended competition to occur on other than a level-playing-field basis, it specifically provided for it. *See, e.g., id.* § 543(a)(2) (exempting overbuilders from rate regulation); *id.* §§ 571, 573 (exempting certain common carriers providing video service from specifically enumerated kinds of cable regulation); *id.* § 572(d)(3) (permitting overbuilders to be acquired where incumbent cable operators would not be).

35.    By applying little, if any, regulation to new entrants and overbuilders while perpetuating more onerous regulation for incumbent cable operators, the Act interferes with Congress's goal of uniform national regulation and contravenes the federal policy favoring level-playing-field competition, and so stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Title VI.

36.    Accordingly, the Act conflicts with a federal statute. Under the Supremacy Clause of the United States Constitution, therefore, the Act is pre-empted and superseded.

## COUNT III

### (Violation of Federal Prohibition on Exclusive Franchises)

37.    Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

38.    Section 621(a)(1) of the Federal Communications Act provides that "a franchising authority may not grant an exclusive franchise and may not unreasonably refuse to award an additional competitive franchise." 47 U.S.C. § 541(a)(1). "'[F]ranchising authority' means any governmental entity empowered by Federal, State, or local law to grant a franchise." *Id.* § 522(10). The Act provides that "the [PUC] shall be designated as the franchising authority for a state-issued franchise." Tex. Util. Code Ann. § 66.001. Thus, under federal law, the PUC may not "unreasonably refuse to award an additional competitive franchise."

39.    Yet, the Act instructs the PUC to refuse to award a franchise to any incumbent cable operator that has a municipal franchise. *See id.* § 66.004(a). At the same time, the Act instructs the PUC to grant a franchise to any overbuilder that elects to renounce its municipal franchises. Thus, the refusal is not reasonable: if overbuilders with existing franchise agreements may renounce their contracts, there is no justification for denying incumbent cable operators that same right.

40.    Accordingly, the Act conflicts with a federal statute. Under the Supremacy Clause of the United States Constitution, therefore, the Act is pre-empted and superseded.

## COUNT IV

### (Violation of Federal Duty to Guard Against Redlining)

41.    Plaintiff repeats and realleges all of the allegations set forth above as if fully set forth herein.

42.    Section 621(a)(3) of the Federal Communications Act provides that, "[i]n awarding a franchise or franchises, a franchising authority shall assure that

access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides." 47 U.S.C. § 541(a)(3). As mentioned, the Act renders the PUC a franchising authority. *See* Tex. Util. Code Ann. § 66.001. Thus, federal law requires the PUC, in awarding a franchise, to make the required assurances.

43.    The Act does not permit the PUC to do so. The Act permits entrants to define their own service areas. *See id.* § 66.003(b)(4). Even within those self-defined service areas, entrants are not required to provide service over their cable system. *See id.* § 66.014(d). The Act requires the PUC to issue a franchise upon fulfillment of certain requirements, none of which protect against redlining. *See id.* § 66.003(a), (b). Moreover, the Act specifically states that the PUC may not impose build-out requirements. *See id.* § 66.007.

44.    Accordingly, the Act conflicts with a federal statute. Under the Supremacy Clause of the United States Constitution, therefore, the Act is pre-empted and superseded.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff requests the following relief:

(1)    a declaration that the Act is unlawful and inconsistent with federal and state law insofar as, among other things:

(a)    it empowers and requires the PUC to grant franchises at all;

(b)    it denies incumbent cable operators the right to renounce their municipal franchises and obtain a state-issued franchise;

- 15 -

(c)    it requires the PUC to grant franchises without assuring that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides;

(2)    an injunction prohibiting Defendants (as well as their agents, assistants, successors, employees, attorneys, and all others persons acting in concert or cooperation with them or under their discretion or control) from enforcing any part of the Act that this Court determines to be unlawful;

(3)    an award of costs and reasonable attorney's fees under 42 U.S.C. § 1988; and

(4)    such other and further relief as this Court may deem just and proper.

Respectfully submitted,

GEORGE & BROTHERS, L.L.P.

By: _____
R. James George, Jr.
State Bar No. 07810000
114 West Seventh Street
Suite 1100
Austin, Texas 78701
(512) 495-1400
(512) 499-0094 (facsimile)

Dated: September 8, 2005                *Counsel for Plaintiff TCTA*

# Exhibit A

By:  Fraser                                    S.B. No. 5

A BILL TO BE ENTITLED

AN ACT

relating to furthering competition in the communications industry.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Section 33.001, Utilities Code, is amended to read as follows:

Sec. 33.001.  MUNICIPAL JURISDICTION.  (a)  To provide fair, just, and reasonable rates and adequate and efficient services, the governing body of a municipality has exclusive original jurisdiction over the rates, operations, and services of an electric utility in areas in the municipality, subject to the limitations imposed by this title.

(b)  Notwithstanding Subsection (a), the governing body of a municipality shall not have jurisdiction over the BPL system, BPL services, telecommunications using BPL services, or the rates, operations, or services of the electric utility or transmission and distribution utility to the extent that such rates, operations, or services are related, wholly or partly, to the construction, maintenance, or operation of a BPL system used to provide BPL services to affiliated or unaffiliated entities.

SECTION 2.  Subtitle B, Title 2, Utilities Code, is amended by adding Chapter 43 to read as follows:

CHAPTER 43.  USE OF ELECTRIC DELIVERY SYSTEM FOR ACCESS TO

[Pages 2-53 have been omitted.]

S.B. No. 5

Government Code.

(d)  The commission shall provide to the committee information regarding rules relating to telecommunications deregulation proposed by the commission.  The committee may submit comments to the commission on those proposed rules.

(e)  The committee shall monitor the effectiveness of telecommunications deregulation, including the fairness of rates, the quality of service, and the effect of regulation on the normal forces of competition.

(f)  The committee may request reports and other information from the commission as necessary to carry out this subchapter.

(g)  Not later than November 15 of each even-numbered year, the committee shall report to the governor, lieutenant governor, and speaker of the house of representatives on the committee's activities under this subchapter.  The report must include:

(1)  an analysis of any problems caused by telecommunications deregulation; and

(2)  recommendations for any legislative action necessary to address those problems and to further competition within the telecommunications industry.

SECTION 27.  Subtitle C, Title 2, Utilities Code, is amended by adding Chapter 66 to read as follows:

CHAPTER 66.  STATE-ISSUED CABLE AND VIDEO FRANCHISE

Sec. 66.001.  FRANCHISING AUTHORITY.  The commission shall be designated as the franchising authority for a state-issued franchise for the provision of cable service or video service.

Page -54 -

S.B. No. 5

Sec. 66.002. DEFINITIONS. In this chapter:

(1) "Actual incremental cost" means only current out-of-pocket expenses for labor, equipment repair, equipment replacement, and tax expenses directly associated with the labor or the equipment of a service provider that is necessarily and directly used to provide what were, under a superseded franchise, in-kind services, exclusive of any profit or overhead such as depreciation, amortization, or administrative expense.

(2) "Cable service" is defined as set forth in 47 U.S.C. Section 522(6).

(3) "Cable service provider" means a person who provides cable service.

(4) "Communications network" means a component or facility that is, wholly or partly, physically located within a public right-of-way and that is used to provide video programming, cable, voice, or data services.

(5) "Franchise" means an initial authorization, or renewal of an authorization, issued by a franchising authority, regardless of whether the authorization is designated as a franchise, permit, license, resolution, contract, certificate, agreement, or otherwise, that authorizes the construction and operation of a cable or video services network in the public rights-of-way.

(6)(A) "Gross revenues" means all consideration of any kind or nature including without limitation cash, credits, property, and in-kind contributions (services or goods) derived by

S.B. No. 5

the holder of a state-issued certificate of franchise authority

from the operation of the cable service provider's or the video

service provider's network to provide cable service or video

service within the municipality.  Gross revenue shall include all

consideration paid to the holder of a state-issued certificate of

franchise authority and its affiliates (to the extent either is

acting as a provider of a cable service or video service as

authorized by this chapter), which shall include but not be limited

to the following:  (i) all fees charged to subscribers for any and

all cable service or video service provided by the holder of a

state-issued certificate of franchise authority; (ii) any fee

imposed on the holder of a state-issued certificate of franchise

authority by this chapter that is passed through and paid by

subscribers (including without limitation the franchise fee set

forth in this chapter); and (iii) compensation received by the

holder of a state-issued certificate of franchise authority or its

affiliates that is derived from the operation of the holder of a

state-issued certificate of franchise authority's network to

provide cable service or video service with respect to commissions

that are paid to the holder of a state-issued certificate of

franchise authority as compensation for promotion or exhibition of

any products or services on the holder of a state-issued

certificate of franchise authority's network, such as a "home

shopping" or a similar channel, subject to Paragraph (B)(v).  Gross

revenue includes a pro rata portion of all revenue derived by the

holder of a state-issued certificate of franchise authority or its

S.B. No. 5

affiliates pursuant to compensation arrangements for advertising derived from the operation of the holder of a state-issued certificate of franchise authority's network to provide cable service or the video service within a municipality, subject to Paragraph (B)(iii). The allocation shall be based on the number of subscribers in the municipality divided by the total number of subscribers in relation to the relevant regional or national compensation arrangement. Advertising commissions paid to third parties shall not be netted against advertising revenue included in gross revenue. Revenue of an affiliate derived from the affiliate's provision of cable service or the video service shall be gross revenue to the extent the treatment of such revenue as revenue of the affiliate and not of the holder of a state-issued certificate of franchise authority has the effect (whether intentional or unintentional) of evading the payment of fees which would otherwise be paid to the municipality. In no event shall revenue of an affiliate be gross revenue to the holder of a state-issued certificate of franchise authority if such revenue is otherwise subject to fees to be paid to the municipality.

(B)  For purposes of this section, "gross revenues" does not include:

(i)  any revenue not actually received, even if billed, such as bad debt;

(ii)  non-cable services or non-video services revenues received by any affiliate or any other person in exchange for supplying goods or services used by the holder of a state-

S.B. No. 5

issued certificate of franchise authority to provide cable service

or video service;

(iii) refunds, rebates, or discounts made to

subscribers, leased access providers, advertisers, or a

municipality;

(iv) any revenues from services classified as

non-cable service or non-video service under federal law including

without limitation revenue received from telecommunications

services; revenue received from information services (but not

excluding cable services or video services); and any other revenues

attributed by the holder of a state-issued certificate of franchise

authority to non-cable service or non-video service in accordance

with Federal Communications Commission or commission rules,

regulations, standards, or orders;

(v) any revenue paid by subscribers to home

shopping programmers directly from the sale of merchandise through

any home shopping channel offered as part of the cable services or

the holder of a state-issued certificate of franchise authority as

compensation for promotion or exhibition of any products or

services on the holder of a state-issued certificate of franchise

authority's network, such as a "home shopping" or a similar

channel;

(vi) the sale of cable services or video

services for resale in which the purchaser is required to collect

this chapter's fees from the purchaser's customer. Nothing under

this chapter is intended to limit state's rights pursuant to 47

S.B. No. 5

U.S.C. Section 542(h);

(vii) the provision of cable services or video services to customers at no charge, as required or allowed by this chapter, including without limitation the provision of cable services or video services to public institutions, as required or permitted in this chapter, including without limitation public schools or governmental entities, as required or permitted in this chapter;

(viii) any tax of general applicability imposed upon the holder of a state-issued certificate of franchise authority or upon subscribers by a city, state, federal, or any other governmental entity and required to be collected by the holder of a state-issued certificate of franchise authority and remitted to the taxing entity (including, but not limited to, sales and use tax, gross receipts tax, excise tax, utility users tax, public service tax, communication taxes, and fees not imposed by this chapter);

(ix) any forgone revenue from the holder of a state-issued certificate of franchise authority's provision of free or reduced cost cable services or video services to any person including without limitation employees of the holder of a state-issued certificate of franchise authority, to the municipality and other public institutions or other institutions as allowed in this chapter; provided, however, that any forgone revenue which the holder of a state-issued certificate of franchise authority chooses not to receive in exchange for trades, barters, services, or other

S.B. No. 5

items of value shall be included in gross revenue;

(x) sales of capital assets or sales of surplus equipment that is not used by the purchaser to receive cable services or video services from the holder of a state-issued certificate of franchise authority;

(xi) directory or Internet advertising revenue including, but not limited to, yellow pages, white pages, banner advertisement, and electronic publishing; and

(xii) reimbursement by programmers of marketing costs incurred by the holder of a state-issued franchise for the introduction of new programming that exceed the actual costs.

(C) For purposes of this definition, a provider's network consists solely of the optical spectrum wavelengths, bandwidth, or other current or future technological capacity used for the transmission of video programming over wireline directly to subscribers within the geographic area within the municipality as designated by the provider in its franchise.

(7) "Incumbent cable service provider" means the cable service provider serving the largest number of cable subscribers in a particular municipal franchise area on September 1, 2005.

(8) "Public right-of-way" means the area on, below, or above a public roadway, highway, street, public sidewalk, alley, waterway, or utility easement in which a municipality has an interest.

(9) "Video programming" means programming provided by,

or generally considered comparable to programming provided by, a
television broadcast station, as set forth in 47 U.S.C. Section
522(20).

(10) "Video service" means video programming services
provided through wireline facilities located at least in part in
the public right-of-way without regard to delivery technology,
including Internet protocol technology. This definition does not
include any video service provided by a commercial mobile service
provider as defined in 47 U.S.C. Section 332(d).

(11) "Video service provider" means a video programming
distributor that distributes video programming services through
wireline facilities located at least in part in the public right-
of-way without regard to delivery technology. This term does not
include a cable service provider.

Sec. 66.003. STATE AUTHORIZATION TO PROVIDE CABLE SERVICE OR
VIDEO SERVICE. (a) An entity or person seeking to provide cable
service or video service in this state after September 1, 2005,
shall file an application for a state-issued certificate of
franchise authority with the commission as required by this
section. An entity providing cable service or video service under
a franchise agreement with a municipality is not subject to this
subsection with respect to such municipality until the franchise
agreement expires, except as provided by Section 66.004.

(a-1) The commission shall notify an applicant for a state-
issued certificate of franchise authority whether the applicant's
affidavit described by Subsection (b) is complete before the 15th

S.B. No. 5

business day after the applicant submits the affidavit.

(b)  The commission shall issue a certificate of franchise authority to offer cable service or video service before the 17th business day after receipt of a completed affidavit submitted by the applicant and signed by an officer or general partner of the applicant affirming:

(1)  that the applicant has filed or will timely file with the Federal Communications Commission all forms required by that agency in advance of offering cable service or video service in this state;

(2)  that the applicant agrees to comply with all applicable federal and state statutes and regulations;

(3)  that the applicant agrees to comply with all applicable municipal regulations regarding the use and occupation of public rights-of-way in the delivery of the cable service or video service, including the police powers of the municipalities in which the service is delivered;

(4)  a description of the service area footprint to be served within the municipality, if applicable, otherwise the municipality to be served by the applicant, which may include certain designations of unincorporated areas, which description shall be updated by the applicant prior to the expansion of cable service or video service to a previously undesignated service area and, upon such expansion, notice to the commission of the service area to be served by the applicant; and

(5)  the location of the applicant's principal place of

Page -62 -

S.B. No. 5

business  and  the  names  of  the  applicant's  principal  executive
officers.

(c)  The  certificate  of  franchise  authority  issued  by  the
commission shall contain:

(1)  a grant of authority to provide cable service or
video service as requested in the application;

(2)  a grant of authority to use and occupy the public
rights-of-way in the delivery of that service, subject to the laws
of this state, including the police powers of the municipalities in
which the service is delivered; and

(3)  a statement that the grant of authority is subject
to lawful operation of the cable service or video service by the
applicant or its successor in interest.

(d)  The  certificate  of  franchise  authority  issued  by  the
commission is fully transferable to any successor in interest to
the  applicant  to  which  it  is  initially  granted.    A  notice  of
transfer  shall  be  filed  with  the  commission  and  the  relevant
municipality within 14 business days of the completion of such
transfer.

(e)  The  certificate  of  franchise  authority  issued  by  the
commission may be terminated by the cable service provider or video
service provider by submitting notice to the commission.

Sec. 66.004.  ELIGIBILITY FOR COMMISSION-ISSUED FRANCHISE.
(a)  A cable service provider or a video service provider that
currently has or had previously received a franchise to provide
cable service or video service with respect to such municipalities

is not eligible to seek a state-issued certificate of franchise authority under this chapter as to those municipalities until the expiration date of the existing franchise agreement, except as provided by Subsections (b) and (c).

(b)  Beginning September 1, 2005, a cable service provider or video service provider that is not the incumbent cable service provider and serves fewer than 40 percent of the total cable customers in a particular municipal franchise area may elect to terminate that municipal franchise and seek a state-issued certificate of franchise authority by providing written notice to the commission and the affected municipality before January 1, 2006.  The municipal franchise is terminated on the date the commission issues the state-issued certificate of franchise authority.

(c)  A cable service provider that serves fewer than 40 percent of the total cable customers in a municipal franchise area and that elects under Subsection (b) to terminate an existing municipal franchise is responsible for remitting to the affected municipality before the 91st day after the date the municipal franchise is terminated any accrued but unpaid franchise fees due under the terminated franchise.  If the cable service provider has credit remaining from prepaid franchise fees, the provider may deduct the amount of the remaining credit from any future fees or taxes it must pay to the municipality, either directly or through the comptroller.

(d)  For purposes of this section, a cable service provider or

S.B. No. 5

video service provider will be deemed to have or have had a
franchise to provide cable service or video service in a specific
municipality if any affiliates or successor entity of the cable or
video provider has or had a franchise agreement granted by that
specific municipality.

(e)  The terms "affiliates or successor entity" in this
section shall include but not be limited to any entity receiving,
obtaining, or operating under a municipal cable or video franchise
through merger, sale, assignment, restructuring, or any other type
of transaction.

(f)  Except as provided in this chapter, nothing in this
chapter is intended to abrogate, nullify, or adversely affect in
any way the contractual rights, duties, and obligations existing
and incurred by a cable service provider or a video service
provider before the enactment of this chapter, and owed or owing to
any private person, firm, partnership, corporation, or other entity
including without limitation those obligations measured by and
related to the gross revenue hereafter received by the holder of a
state-issued certificate of franchise authority for services
provided in the geographic area to which such prior franchise or
permit applies.  All liens, security interests, royalties, and
other contracts, rights, and interests in effect on September 1,
2005, shall continue in full force and effect, without the
necessity for renewal, extension, or continuance, and shall be paid
and performed by the holder of a state-issued certificate of
franchise authority, and shall apply as though the revenue

S.B. No. 5

generated by the holder of a state-issued certificate of franchise authority continued to be generated pursuant to the permit or franchise issued by the prior local franchising authority or municipality within the geographic area to which the prior permit or franchise applies.  It shall be a condition to the issuance and continuance of a state-issued certificate of franchise authority that the private contractual rights and obligations herein described continue to be honored, paid, or performed to the same extent as though the cable service provider continued to operate under its prior franchise or permit, for the duration of such state-issued certificate of franchise authority and any renewals or extensions thereof, and that the applicant so agrees.  Any person, firm, partnership, corporation, or other entity holding or claiming rights herein reserved may enforce same by an action brought in a court of competent jurisdiction.

Sec. 66.005.  FRANCHISE FEE.  (a)  The holder of a state-issued certificate of franchise authority shall pay each municipality in which it provides cable service or video service a franchise fee of five percent based upon the definition of gross revenues as set forth in this chapter.  That same franchise fee structure shall apply to any unincorporated areas that are annexed by a municipality after the effective date of the state-issued certificate of franchise authority.

(b)  The franchise fee payable under this section is to be paid quarterly, within 45 days after the end of the quarter for the preceding calendar quarter.  Each payment shall be accompanied by a

S.B. No. 5

summary explaining the basis for the calculation of the fee.    A municipality may review the business records of the cable service provider or video service provider to the extent necessary to ensure compensation in accordance with Subsection (a).    Each party shall bear the party's own costs of the examination.    A municipality may, in the event of a dispute concerning compensation under this section, bring an action in a court of competent jurisdiction.

    (c)    The holder of a state-issued certificate of franchise authority may recover from the provider's customers any fee imposed by this chapter.

    Sec. 66.006.    IN-KIND    CONTRIBUTIONS    TO    MUNICIPALITY. (a)    Until the expiration of the incumbent cable service provider's agreement, the holder of a state-issued certificate of franchise authority shall pay a municipality in which it is offering cable service or video service the same cash payments on a per subscriber basis as required by the incumbent cable service provider's franchise agreement.    All cable service providers and all video service providers shall report quarterly to the municipality the total number of subscribers served within the municipality.    The amount paid by the holder of a state-issued certificate of franchise authority shall be calculated quarterly by the municipality by multiplying the amount of cash payment under the incumbent cable service provider's franchise agreement by a number derived by dividing the number of subscribers served by a video service provider or cable service provider by the total number of

Page  -67 -

video or cable service subscribers in the municipality.  Such pro rata payments are to be paid quarterly to the municipality within 45 days after the end of the quarter for the preceding calendar quarter.

(b)  On the expiration of the incumbent cable service provider's agreement, the holder of a state-issued certificate of franchise authority shall pay a municipality in which it is offering cable service or video service one percent of the provider's gross revenues, as defined by this chapter, or at the municipality's election, the per subscriber fee that was paid to the municipality under the expired incumbent cable service provider's agreement, in lieu of in-kind compensation and grants. Payments under this subsection shall be paid in the same manner as outlined in Section 66.005(b).

(c)  All fees paid to municipalities under this section are paid in accordance with 47 U.S.C. Sections 531 and 541(a)(4)(B) and may be used by the municipality as allowed by federal law; further, these payments are not chargeable as a credit against the franchise fee payments authorized under this chapter.

(d)  The following services shall continue to be provided by the cable provider that was furnishing services pursuant to its municipal cable franchise until January 1, 2008, or until the term of the franchise was to expire, whichever is later, and thereafter as provided in Subdivisions (1) and (2) below:

(1)  institutional network capacity, however defined or referred to in the municipal cable franchise but generally

referring to a private line data network capacity for use by the municipality for noncommercial purposes, shall continue to be provided at the same capacity as was provided to the municipality prior to the date of the termination, provided that the municipality will compensate the provider for the actual incremental cost of the capacity; and

　　　　(2)　cable services to community public buildings, such as municipal buildings and public schools, shall continue to be provided to the same extent provided immediately prior to the date of the termination.　Beginning on January 1, 2008, or the expiration of the franchise agreement, whichever is later, a provider that provides the services may deduct from the franchise fee to be paid to the municipality an amount equal to the actual incremental cost of the services if the municipality requires the services after that date.　Such cable service generally refers to the existing cable drop connections to such facilities and the tier of cable service provided pursuant to the franchise at the time of the termination.

　　　Sec. 66.007.　BUILD-OUT.　The holder of a state-issued certificate of franchise authority shall not be required to comply with mandatory build-out provisions.

　　　Sec. 66.008.　CUSTOMER SERVICE STANDARDS.　The holder of a state-issued certificate of franchise authority shall comply with customer service requirements consistent with 47 C.F.R. Section 76.309(c) until there are two or more providers offering service, excluding direct-to-home satellite service, in the relevant

municipality.

Sec. 66.009.  PUBLIC, EDUCATIONAL, AND GOVERNMENTAL ACCESS CHANNELS.  (a)  Not later than 120 days after a request by a municipality, the holder of a state-issued certificate of franchise authority shall provide the municipality with capacity in its communications  network  to  allow  public,  educational,  and governmental (PEG) access channels for noncommercial programming.

(b)  The holder of a state-issued certificate of franchise authority shall provide no fewer than the number of PEG access channels a municipality has activated under the incumbent cable service provider's franchise agreement as of September 1, 2005.

(c)  If a municipality did not have PEG access channels as of September 1, 2005, the cable service provider or video service provider shall furnish:

(1)  up to three PEG channels for a municipality with a population of at least 50,000; and

(2)  up to two PEG channels for a municipality with a population of less than 50,000.

(d)  Any PEG channel provided pursuant to this section that is not utilized by the municipality for at least eight hours a day shall no longer be made available to the municipality, but may be programmed  at  the  cable  service  provider's  or  video  service provider's discretion.  At  such  time  as  the  municipality can certify to the cable service provider or video service provider a schedule for at least eight hours of daily programming, the cable service  provider  or  video  service  provider  shall  restore  the

S.B. No. 5

previously lost channel but shall be under no obligation to carry that channel on a basic or analog tier.

(e)  In the event a municipality has not utilized the minimum number of access channels as permitted by Subsection (c), access to the additional channel capacity allowed in Subsection (c) shall be provided upon 90 days' written notice if the municipality meets the following standard:  if a municipality has one active PEG channel and wishes to activate an additional PEG channel, the initial channel shall be considered to be substantially utilized when 12 hours are programmed on that channel each calendar day.  In addition, at least 40 percent of the 12 hours of programming for each business day on average over each calendar quarter must be nonrepeat programming.  Nonrepeat programming shall include the first three video-castings of a program.  If a municipality is entitled to three PEG channels under Subsection (c) and has in service two active PEG channels, each of the two active channels shall be considered to be substantially utilized when 12 hours are programmed on each channel each calendar day and at least 50 percent of the 12 hours of programming for each business day on average over each calendar quarter is nonrepeat programming for three consecutive calendar quarters.

(f)  The operation of any PEG access channel provided pursuant to this section shall be the responsibility of the municipality receiving the benefit of such channel, and the holder of a state-issued certificate of franchise authority bears only the responsibility for the transmission of such channel.  The holder of

S.B. No. 5

a state-issued certificate of franchise authority shall be responsible for providing the connectivity to each PEG access channel distribution point up to the first 200 feet.

(g)  The municipality must ensure that all transmissions, content, or programming to be transmitted over a channel or facility by a holder of a state-issued certificate of franchise authority are provided or submitted to the cable service provider or video service provider in a manner or form that is capable of being accepted and transmitted by a provider, without requirement for additional alteration or change in the content by the provider, over the particular network of the cable service provider or video service provider, which is compatible with the technology or protocol utilized by the cable service provider or video service provider to deliver services.

(h)  Where technically feasible, the holder of a state-issued certificate of franchise authority and an incumbent cable service provider shall use reasonable efforts to interconnect their cable or video systems for the purpose of providing PEG programming. Interconnection may be accomplished by direct cable, microwave link, satellite, or other reasonable method of connection.  Holders of a state-issued certificate of franchise authority and incumbent cable service providers shall negotiate in good faith and incumbent cable service providers may not withhold interconnection of PEG channels.

(i)  A court of competent jurisdiction shall have exclusive jurisdiction to enforce any requirement under this section.

S.B. No. 5

Sec. 66.010. NONDISCRIMINATION BY MUNICIPALITY. (a) A municipality shall allow the holder of a state-issued certificate of franchise authority to install, construct, and maintain a communications network within a public right-of-way and shall provide the holder of a state-issued certificate of franchise authority with open, comparable, nondiscriminatory, and competitively neutral access to the public right-of-way. All use of a public right-of-way by the holder of a state-issued certificate of franchise authority is nonexclusive and subject to Section 66.011.

(b) A municipality may not discriminate against the holder of a state-issued certificate of franchise authority regarding:

(1) the authorization or placement of a communications network in a public right-of-way;

(2) access to a building; or

(3) a municipal utility pole attachment term.

Sec. 66.011. MUNICIPAL POLICE POWER; OTHER AUTHORITY. (a) A municipality may enforce police power-based regulations in the management of a public right-of-way that apply to the holder of a state-issued certificate of franchise authority within the municipality. A municipality may enforce police power-based regulations in the management of the activities of the holder of a state-issued certificate of franchise authority to the extent that they are reasonably necessary to protect the health, safety, and welfare of the public. Police power-based regulation of the holder of a state-issued certificate of franchise authority's use of the

public right-of-way must be competitively neutral and may not be

unreasonable or discriminatory.  A municipality may not impose on

activities of the holder of a state-issued certificate of franchise

authority a requirement:

       (1)  that particular business offices be located in the

municipality;

       (2)  regarding the filing of reports and documents with

the municipality that are not required by state or federal law and

that are not related to the use of the public right-of-way except

that a municipality may request maps and records maintained in the

ordinary course of business for purposes of locating the portions

of a communications network that occupy public rights-of-way.  Any

maps or records of the location of a communications network

received by a municipality shall be confidential and exempt from

disclosure under Chapter 552, Government Code, and may be used by a

municipality only for the purpose of planning and managing

construction activity in the public right-of-way.  A municipality

may not request information concerning the capacity or technical

configuration of the holder of a state-issued certificate of

franchise authority's facilities;

       (3)  for the inspection of the holder of a state-issued

certificate of franchise authority's business records except to

extent permitted under Section 66.005(b);

       (4)  for the approval of transfers of ownership or

control of the holder of a state-issued certificate of franchise

authority's business, except that a municipality may require that

S.B. No. 5

the holder of a state-issued certificate of franchise authority

maintain a current point of contact and provide notice of a

transfer within a reasonable time; or

     (5)  that the holder of a state-issued certificate of

franchise authority that is self-insured under the provisions of

state law obtain insurance or bonding for any activities within the

municipality, except that a self-insured provider shall provide

substantially the same defense and claims processing as an insured

provider.  A bond may not be required from a provider for any work

consisting of aerial construction except that a reasonable bond may

be required of a provider that cannot demonstrate a record of at

least four years' performance of work in any municipal public

right-of-way free of currently unsatisfied claims by a municipality

for damage to the right-of-way.

    (b)  Notwithstanding any other law, a municipality may require

the issuance of a construction permit, without cost, to the holder

of a state-issued certificate of franchise authority that is

locating facilities in or on a public right-of-way in the

municipality.  The terms of the permit shall be consistent with

construction permits issued to other persons excavating in a public

right-of-way.

    (c)  In the exercise of its lawful regulatory authority, a

municipality shall promptly process all valid and administratively

complete applications of the holder of a state-issued certificate

of franchise authority for a permit, license, or consent to

excavate, set poles, locate lines, construct facilities, make

S.B. No. 5

repairs, affect traffic flow, or obtain zoning or subdivision regulation approvals or other similar approvals. A municipality shall make every reasonable effort not to delay or unduly burden the provider in the timely conduct of the provider's business.

(d)  If there is an emergency necessitating response work or repair, the holder of a state-issued certificate of franchise authority may begin the repair or emergency response work or take any action required under the circumstances without prior approval from the affected municipality, if the holder of a state-issued certificate of franchise authority notifies the municipality as promptly as possible after beginning the work and later obtains any approval required by a municipal ordinance applicable to emergency response work.

(e)  The commission shall have no jurisdiction to review such police power-based regulations and ordinances adopted by a municipality to manage the public rights-of-way.

Sec. 66.012.  INDEMNITY IN CONNECTION WITH RIGHT-OF-WAY; NOTICE OF LIABILITY.  (a)  The holder of a state-issued certificate of franchise authority shall indemnify and hold a municipality and its officers and employees harmless against any and all claims, lawsuits, judgments, costs, liens, losses, expenses, fees (including reasonable attorney's fees and costs of defense), proceedings, actions, demands, causes of action, liability, and suits of any kind and nature, including personal or bodily injury (including death), property damage, or other harm for which recovery of damages is sought, that is found by a court of

S.B. No. 5

competent jurisdiction to be caused solely by the negligent act, error, or omission of the holder of a state-issued certificate of franchise authority or any agent, officer, director, representative, employee, affiliate, or subcontractor of the holder of a state-issued certificate of franchise authority or their respective officers, agents, employees, directors, or representatives, while installing, repairing, or maintaining facilities in a public right-of-way. The indemnity provided by this subsection does not apply to any liability resulting from the negligence of the municipality or its officers, employees, contractors, or subcontractors. If the holder of a state-issued certificate of franchise authority and the municipality are found jointly liable by a court of competent jurisdiction, liability shall be apportioned comparatively in accordance with the laws of this state without, however, waiving any governmental immunity available to the municipality under state law and without waiving any defenses of the parties under state law. This subsection is solely for the benefit of the municipality and the holder of a state-issued certificate of franchise authority and does not create or grant any rights, contractual or otherwise, for or to any other person or entity.

(b) The holder of a state-issued certificate of franchise authority and a municipality shall promptly advise the other in writing of any known claim or demand against the holder of a state-issued certificate of franchise authority or the municipality related to or arising out of the holder of a state-issued

certificate of franchise authority's activities in a public right-of-way.

(c)  The commission shall have no jurisdiction to review such police power-based regulations and ordinances adopted by a municipality to manage the public rights-of-way.

Sec. 66.013.  MUNICIPAL  AUTHORITY.    In  addition  to  a municipality's authority to exercise its nondiscriminatory police power with respect to public rights-of-way under current law, a municipality's authority to regulate the holder of state-issued certificate of franchise authority is limited to:

(1)  a requirement that the holder of a state-issued certificate of franchise authority who is providing cable service or video service within the municipality register with the municipality and maintain a point of contact;

(2)  the establishment of reasonable guidelines regarding the use of public, educational, and governmental access channels; and

(3)  submitting reports within 30 days on the customer service standards referenced in Section 66.008 if the provider is subject to those standards and has continued and unresolved customer service complaints indicating a clear failure on the part of the holder of a state-issued certificate of franchise authority to comply with the standards.

Sec. 66.014.  DISCRIMINATION PROHIBITED.  (a)  The purpose of this section is to prevent discrimination among potential residential subscribers.

S.B. No. 5

(b)  A cable service provider or video service provider that has been granted a state-issued certificate of franchise authority may not deny access to service to any group of potential residential subscribers because of the income of the residents in the local area in which such group resides.

(c)  An affected person may seek enforcement of the requirements described by Subsection (b) by initiating a proceeding with the commission.  A municipality within which the potential residential cable service or video service subscribers referenced in Subsection (b) may be considered an affected person for purposes of this section.

(d)  The holder of a state-issued certificate of franchise authority shall have a reasonable period of time to become capable of providing cable service or video service to all households within the designated franchise area as defined in Section 66.003(b)(4) and may satisfy the requirements of this section through the use of an alternative technology that provides comparable content, service, and functionality.

(e)  Notwithstanding any provision of this chapter, the commission has the authority to make the determination regarding the comparability of the technology and the service provided. Notwithstanding any provision of this chapter, the commission has the authority to monitor the deployment of cable services, video services, or alternate technology.

Sec. 66.015.  COMPLIANCE.  (a)  Should the holder of a state-issued certificate of franchise authority be found by a court of

competent jurisdiction to be in noncompliance with the requirements of this chapter, the court shall order the holder a state-issued certificate of franchise authority, within a specified reasonable period of time, to cure such noncompliance. Failure to comply shall subject the holder of the state-issued franchise of franchise authority to penalties as the court shall reasonably impose, up to and including revocation of the state-issued certificate of franchise authority granted under this chapter.

(b) A municipality within which the provider offers cable service or video service shall be an appropriate party in any such litigation.

Sec. 66.016. APPLICABILITY OF OTHER LAWS. (a) Nothing in this chapter shall be interpreted to prevent a voice provider, cable service provider or video service provider, or municipality from seeking clarification of its rights and obligations under federal law or to exercise any right or authority under federal or state law.

(b) Nothing in this chapter shall limit the ability of a municipality under existing law to receive compensation for use of the public rights-of-way from entities determined not to be subject to all or part of this chapter, including but not limited to provider of Internet protocol cable or video services, unless such payments are expressly prohibited by federal law.

Sec. 66.017. STUDY. (a) The telecommunications competitiveness legislative oversight committee shall conduct a joint interim study with the commission regarding the following:

(1) appropriate alternative forms of competitively neutral compensation methodology that should flow to municipalities from all sources related to the provision of information services, telecommunication services, cable services, and video services;

(2) right-of-way access and fees;

(3) the transition from local franchise authority to state-issued authority, including methods to maintain current municipal revenue streams, including franchise fees and in-kind contributions; continuation of public, educational, and governmental access channels; and build-out requirements; and

(4) other relevant issues.

(b) The committee shall report its findings to the lieutenant governor and speaker of the House of Representatives no later than December 31, 2006.

(c) This section expires January 1, 2007.

SECTION 28. Section 283.002, Local Government Code, is amended by amending Subdivision (2) and adding Subdivision (7) to read as follows:

(2) "Certificated telecommunications provider" means a person who has been issued a certificate of convenience and necessity, certificate of operating authority, or service provider certificate of operating authority by the commission to offer local exchange telephone service or a person who provides voice service.

(7) "Voice service" means voice communications services provided through wireline facilities located at least in part in the public right-of-way, without regard to the delivery technology,

S.B. No. 5

including Internet protocol technology.  The term does not include

voice service provided by a commercial mobile service provider as

defined by 47 U.S.C. Section 332(d).

SECTION 29.  The following provisions of the Utilities Code are repealed:

      (1)  Subchapters B through F, Chapter 62; and

      (2)  Chapters 61 and 63.

SECTION 30.  The Public Utility Commission of Texas shall conduct a study to determine whether Title 2, Utilities Code, adequately preserves customer choice in the Internet-enabled applications employed in association with broadband service and shall report its conclusions and recommendations to the legislature not later than January 1, 2007.  The study must include consultation with and comment from all interested parties.

SECTION 31.  If any provision of this Act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this Act that can be given effect without the invalid provision or application, and to this end the provisions of this Act are declared to be severable.

SECTION 32.  This Act takes effect September 1, 2005, if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for effect on that date, this Act takes effect on the 91st day after the last day of the legislative session.